Christine T. Greenwood (8187)
  greenwood@mcgiplaw.com
Jennifer Fraser Parrish (11207)
  parrish@mcgiplaw.com
Kennedy D. Nate (14266)
  nate@mcgiplaw.com
**MAGLEBY CATAXINOS & GREENWOOD**
170 South Main Street, Suite 1100
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **SHC HOLDCO Inc., a Delaware corporation,**<br><br>　　**Plaintiff,**<br><br>**v.**<br><br>**SHANNON SHARP, an individual,**<br><br>　　**Defendant.** | **COMPLAINT**<br><br>**AND**<br><br>**JURY DEMAND**<br><br>**Case No.:  2:16-cv-00472-DBP**<br><br>**Magistrate Judge Dustin B. Pead** |

Plaintiff SHC Holdco, Inc. ("SHC" or "Plaintiff") complains and alleges against

Defendant Shannon Sharp ("Sharp" or "Defendant") as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      SHC is a Delaware corporation with its principal place of business in Park

City, Utah.

2.      Sharp is an individual who resides in Crowley, Texas, and who was

employed by SHC until January 29, 2016.

3.      The Court has jurisdiction over this action under 28 U.S.C. § 1332, because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and the dispute is between citizens of different states.

4.      Sharp is subject to this Court's personal jurisdiction based on his contacts with the State of Utah and because he expressly consented to the jurisdiction of this Court, the United States District Court for the District of Utah.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and the agreement between the parties.

## FACTUAL ALLEGATIONS

### Sharp's Employment with SHC

6.      SHC is a healthcare-staffing company that matches healthcare professionals with healthcare facilities.  SHC operates sixty local offices in markets throughout the United States.  SHC operates through its wholly-owned subsidiary, SHC Services, Inc., which conducts business as Supplemental Health Care.

7.      Sharp was employed at SHC's Fort Worth and Dallas, Texas, offices as a Senior Strategic Account Recruiter from approximately February 18, 2014, through January 29, 2016.

8.      Sharp is now employed in the same area of Texas in a nearly identical position by a direct competitor of SHC, Parallon Workforce Management Solutions, LLC and/or one of Parallon's affiliated entities (collectively, with its affiliates, "Parallon").

9.      As a Senior Strategic Account Recruiter, Sharp's duties included recruiting healthcare professionals, or "talent," to add to SHC's database of healthcare

professionals from which it draws to satisfy the needs of its healthcare-facility clients. Although Sharp recruited mainly for the Texas market, he was able to and did pull leads for recruits nationwide.

10.     Sharp's duties necessarily entailed substantial direct contact with SHC's healthcare professionals, interactions with SHC's healthcare facility clients, and frequent contact with other important persons and entities related to SHC's business.

11.     Sharp fostered relationships on SHC's behalf and placed SHC's recruited talent with numerous facilities in Texas, including multiple medical facilities, agencies, and hospital systems.

12.     SHC fully trained Sharp in its business operations, familiarized him with the healthcare-staffing market served by SHC, and instructed him on skills necessary for success in healthcare recruiting.  Among other things, SHC provided onboard training and became a part of SHC's mentor program for its internal staff members.

13.     SHC gave Sharp access to its confidential, trade secret business and customer information, including information regarding SHC's financial and pricing structure.  SHC provided this information to Sharp so that he could perform his duties for the benefit of SHC.  All of this information would be useful to competitors.

14.     Sharp was successful at strengthening SHC's existing client relationships, partnering with existing clients to ensure placement of SHC's healthcare professionals, and developing new clients.

15.     Sharp successfully developed a substantial network of healthcare professionals who could be employed by SHC to fill various staffing needs.

16.     Sharp was a top producer at SHC.  During the period of time in which he was employed with SHC, Sharp's efforts resulted in approximately 237 healthcare professionals being hired by SHC clients, which generated approximately $804,729 in revenue.

## Non-Competition, Non-Solicitation and Confidentiality Agreement

17.     On August 10, 2015, Sharp entered into a Non-Competition, Non-Solicitation and Confidentiality Agreement (the "Agreement") with SHC.[1]

18.     Among other things, the Agreement includes a provision by which Sharp agreed not to compete with SHC for a period of one year following the cessation of his employment with SHC, defined in the Agreement as the "Restriction Period."[2]  This provision states as follows:

> Non-Competition.  Except on behalf of the Company, [E]mployee shall not individually or on behalf of any other person or entity, as an employee, advisor, consultant, owner, operator, or otherwise, engage, directly or indirectly, in the business of arranging or providing (a) travel physician, travel nurse, travel therapy and/or travel allied healthcare staffing services in the United States; or (b) temporary nurse, temporary therapy and/or temporary allied healthcare professional staffing services within a fifty (50) mile radius of the office in which the Employee was employed by or performed work for the Company.  The business described in the immediately preceding sentence, clauses (a) and (b), are hereinafter collectively referred to as the "Core Business."[3]

19.     The Agreement also prohibits Sharp from soliciting SHC's employees during the Restriction Period:

---

[1] A copy of the Agreement is attached as Exhibit 1.

[2] *See* Agreement at § 2, Ex. 1.

[3] *Id.* at § 4(a)(i).

4

Non-Solicitation of Employees.  Employee shall not directly or indirectly solicit or attempt to solicit any employee of the Company or any subsidiary or affiliate of Company to induce, or attempt to induce, any employee of the Company to leave such employ, or to accept any other position or employment or assist any other person or entity in hiring such employee.[4]

20.     Additionally, the Agreement precludes Sharp from soliciting SHC's

customers and clients during the Restriction Period:

Non-Solicitation of Customers and Clients.  Employee shall not, except at the direction of the Company, directly or indirectly solicit, or attempt to solicit, any persons or entities who or which are clients or customers in connection with the engagement of such customers or clients, by any person or entity, in any aspect of the Core Business.[5]

21.     For purposes of the Agreement, "customers and clients" is defined as:

[A]ll persons and entities, including healthcare professionals, for whom the Company performs or has performed services or proposed to perform services with whom Employee had any contact or dealings during the twelve (12) months prior to the termination of Employee's relationship with the Company and, additionally, those persons and entities who were disclose[d] to Employee, intentionally or unintentionally, as customers or prospective customers of the Company during the twelve (12) months prior to the termination of Employee's Relationship with the Company.[6]

22.     In furtherance of the non-solicitation provisions of the Agreement,

provisions regarding non-interference and non-disparagement are included, by which

Sharp is prohibited among other things from "disrupt[ing] or interfer[ing] with, or

attempt[ing] to disrupt or interfere with the relations of the Company with any actual or

---

[4] *Id.* at § 4(a)(ii).

[5] *Id.* at § 4(a)(iii).

[6] *Id.*

potential clients or customers of the Company,"[7] and from "publicly or privately

disparag[ing], criticiz[ing] or otherwise refer[ring] to the Company or any director, officer,

or employee thereof in an adverse or unflattering fashion."[8]

23.    The Agreement also includes comprehensive provisions prohibiting Sharp

from at any time using or disclosing to any third party any of the SHC's proprietary

information, and requiring Sharp to return any proprietary information at the conclusion

of his employment.[9]

24.    The Agreement sets forth the definition of "proprietary information" as

follows:

> For purposes of this Agreement, the term "Proprietary Information" shall mean, whether in writing or otherwise, the Company's client lists, information and data related to the providing of services to clients; the identity of clients, prospects, talent and vendors of the Company, including names, addresses, telephone and fax numbers, e-mail addresses, and other contact information; the operation, business habits and practices and statistical information regarding customers, prospects, talent and vendees of the Company, including names, addresses, telephone and fax numbers, e-mail addresses, and other contact information; the operation, business habits and practices and statistical information regarding customers, prospects, talent and vendees of the Company; pricing and margins; unique training materials and tools; financial data, specifically including cost of operations, gross and net profit, debts and liabilities and financing; business plans, and any other unique information or data, or compilation or configuration thereof, composed, drafted or organized specifically for exclusive use by the Company and related to those items or category of items identified in this paragraphs the disclosure of which has the tendency to cause immediate and irreparable harm to the

---

[7] *Id.* at § 4(a)(iv).

[8] *Id.* at § 4(a)(v).

[9] *See id.* at §§ 3(b)-(c).

Company.    Proprietary Information shall also include third party information provided to the Company under an obligation of confidentiality.[10]

25.     As to remedies for breach of the Agreement, injunctive relief is specifically contemplated, and Sharp agreed to the propriety of such relief.  In addition, in the event of a breach, the Restriction Period during which Sharp remains subject to the non-competition and non-solicitation provisions of the Agreement is extended such that it runs from the date an injunction is entered:

> Remedies:   The Employee agrees that damages cannot reasonably compensate the Company in the event of a violation of the covenants and restrictions in this Agreement and that it would be difficult to ascertain the damages which would be suffered by the Company.  Accordingly, the Employee hereby agrees and consents that in the event of any such breach or violation thereof, the Company shall be entitled to and may obtain injunctive relief in order to prevent a continued violation of the terms of this Agreement.  In the event an injunction is sought and obtained, Employee agrees that the Restriction Period referred to in this Agreement shall be extended to run from the Commencement Date to a date twelve months from the date of entry of any injunction or the Expiration Date, whichever is later.  The foregoing shall not limit the Company in the pursuit of any other rights or remedies it may have hereunder or at law or in equity, including damages.[11]

26.     Utah law governs the Agreement, and Sharp expressly consented to the jurisdiction of this Court by entering into the Agreement.[12]  The Agreement provides that

---

[10] *Id.* at § 3(a).

[11] *Id.* at § 5(b) (emphasis added).

[12] *Id.* at § 7(d) ("Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the jurisdiction of the courts of the Third Judicial District in and for the State of Utah, Summit County and of the United States District Court for the District of Utah, which shall be the sole and exclusive jurisdictions and forums to commence any litigation arising out of or relating to this Agreement (and agrees not to commence any litigation relating thereto except in such courts).").

any litigation relating to the Agreement shall be brought only in this Court or the Third Judicial District Court, Summit County, State of Utah.

## SHC and the Healthcare Staffing Industry

27.     Since its founding approximately thirty years ago, SHC has grown to become one of the largest healthcare-staffing agencies in the country.

28.     Healthcare-staffing agencies like SHC allow healthcare providers to outsource and streamline their recruiting and hiring processes.

29.     The healthcare-staffing industry is highly competitive, with over 300 participants nationwide, all of which compete with SHC in some or all aspects of its business.

30.     The manner in which a healthcare-staffing company functions is that, once a healthcare facility determines it has a particular need – whether for a physician, nurse, or other healthcare professional – the facility notifies the staffing companies with which it has relationships.

31.     Upon receipt of notice from a client facility, the staffing company then seeks to recruit an appropriate candidate for the position from its database of qualified professionals, or through the development of new relationships with interested professionals.

32.     The staffing company then presents qualified candidates to the requesting facility, competing with other staffing companies to convince the facility to hire its candidates rather than those of its competitors.  A staffing company generally receives

compensation only upon the healthcare facility's selection of a candidate presented by that staffing company.

33.     The value SHC provides to its healthcare-facility clients depends on SHC's network of relationships and its goodwill.  SHC recruits healthcare professionals, assembles the recruited talent into a database, and then draws from this recruited talent to fill open positions at its client facilities.

34.     SHC's history, course of dealing, and reputation lead its healthcare facility clients to develop a level of trust and confidence in SHC, which in turn render the clients more likely to select the healthcare professionals presented by SHC rather than those presented by SHC's competitors.  SHC develops its goodwill through the high quality of healthcare professionals it is able to recruit, its relationships with its healthcare-facility clients, and the relationships between SHC personnel, the healthcare professionals they recruit, and the healthcare facilities they serve.

35.     Just as SHC's healthcare-facilities clients develop a level of confidence in the services provided by SHC, healthcare professionals recruited by SHC must also have confidence in SHC.  Healthcare professionals typically have numerous different staffing companies through which they may seek employment, such that trust and confidence in SHC is critical.  Healthcare professionals develop such trust and confidence largely through interactions with SHC's recruiters.  Through such interactions, the professionals come to understand that SHC's recruiters will not contact them with positions in unacceptable locations, for which they are not qualified, or where the compensation is inadequate.

36.     SHC's recruiting staff have frequent contact with the healthcare professionals SHC hopes eventually to place at client facilities.  Senior Strategic Account Recruiters are responsible for maintaining SHC's relationships with professionals and clients and assuring that SHC has a substantial database of interested and willing professionals from which to recruit on notification of an employment opportunity by one of SHC's client facilities.

37.     Because SHC's relationships with its healthcare-facility clients and its recruited healthcare professionals are the lifeblood of its business, and because of the highly competitive nature of the healthcare staffing industry and the attendant value of a company's proprietary information and customer contacts, SHC takes great care to protect those relationships and its confidential information.

38.     Among the steps taken by SHC to protect its relationships and retain its proprietary information in confidence is to require its employees to enter into non-competition, non-solicitation and confidentiality agreements like the Agreement in this case.

### Sharp's Resignation and Breaches of the Agreement

39.     Sharp's last day of employment with SHC was January 29, 2016.

40.     Shortly after Sharp's employment with SHC ended, and significantly before the expiration of the Restriction Period under the Agreement, Sharp accepted employment with Parallon, in breach of the non-competition provisions of the Agreement.

41.     Parallon is a direct competitor of SHC.  Like SHC, Parallon is engaged in the healthcare staffing business across the United States.

42.     Since the termination of his employment, Sharp has on at least one occasion solicited or attempted to solicit other SHC employees to depart their employment with SHC and join him at Parallon.  This conduct directly violates the non-solicitation provisions of the Agreement.

43.     On March 3, 2016, then-counsel for SHC sent a cease and desist letter to Sharp, reminding him of his obligations under the Agreement, informing him of his breach of the Agreement, and reserving SHC's rights to pursue enforcement of the Agreement.

44.     Despite the provisions of the Agreement and despite SHC's March 3, 2016 letter, Sharp has remained in the employ of Parallon and continues to violate the Agreement.  At least one of Sharp's efforts to solicit an SHC employee occurred after his receipt of the March 3, 2016 letter.

45.     Upon information and belief, Sharp has or will solicit or attempted to solicit clients, healthcare professionals, and customers of SHC; and, if Sharp has not already done so, it is inevitable under the circumstances that Sharp will solicit or attempt to solicit SHC's clients and customers, or at least there is material risk that he will do so, where Sharp is employed by a direct competitor of SHC in the same type of position and geographical area.

46.     Upon information and belief, Sharp has or will improperly use and/or disclosed to Parallon proprietary and trade secret information belonging to SHC, which

11

Sharp obtained solely as a result of his employment of SHC; and, if Sharp has not

already done so, it is inevitable under the circumstances that Sharp will improperly use

and/or disclose to Parallon proprietary and trade secret information belonging to SHC,

or at least there is a material risk that he will do so, where Sharp is employed by a direct

competitor of SHC in the same type of position and geographical area.

47.     As a direct and proximate result of Sharp's violations of the Agreement,

Sharp has caused and will continue to cause substantial irreparable injury and damage

to SHC, among other injuries.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

48.     Plaintiff incorporates the preceding paragraphs by reference.

49.     The Agreement is valid, binding, and enforceable as between Plaintiff and

Defendant.

50.     SHC fully performed its obligations under the Agreement.

51.     Defendant materially breached and continues to breach the Agreement by

accepting employment within the scope of the Core Business from a direct competitor

within fifty miles of the office by which Defendant was employed or in which Defendant

performed work.

52.     Defendant materially breached the Agreement by soliciting or attempting

to solicit at least one SHC employee.

53.     As a direct and proximate result of Defendant's breach of contract, Plaintiff

is entitled to injunctive relief and has suffered damages in an amount to be determined

at trial, plus interest, costs, and attorney's fees incurred in connection with this action.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

54.     Plaintiff incorporates the preceding paragraphs by reference.

55.     The Agreement is a binding and enforceable contract between Plaintiff

and Defendant.

56.     The Agreement contains implied covenants of good faith and fair dealing.

57.     Plaintiff has fully performed its obligations under the Agreement.

58.     Defendant's conduct is inconsistent with the agreed upon common

purposes of the Agreement and Plaintiff's justified expectations under the Agreement.

59.     Defendant has breached his obligation of good faith and fair dealing to the

Plaintiff by acting inconsistently with the purposes of the Agreement and undermining

Plaintiff's justified expectations.

60.     As a direct and proximate result of Defendant's breach of the covenant of

good faith and fair dealing, Plaintiff is entitled to injunctive relief has suffered damages

in an amount to be determined at trial, plus interest, costs, and attorney's fees incurred

in connection with this action.

## THIRD CAUSE OF ACTION
### (Injunction)

61.     Plaintiff incorporates the preceding paragraphs by reference.

62.     Defendants have violated Plaintiff's rights and have otherwise acted in an

unlawful manner, as set forth in the preceding Causes of Action.  Plaintiff has a

substantial likelihood of prevailing on the merits of these claims.

13

63.     Unless an injunction issues, Plaintiff will suffer irreparable harm, including but not limited to permanent injury to its goodwill, ability to do business, and/or loss of business in an amount difficult or impossible to quantify.

64.     An injunction would not be adverse to the public interest.

65.     The threatened injury to Plaintiff outweighs whatever damage an injunction could cause to Defendant.

66.     There is a substantial likelihood that Plaintiff will prevail on the merits of the underlying claims for which injunctive relief is sought, or there are serious issues on the merits which should be the subject of further litigation.

67.     Therefore, under Rule 65 of the Federal Rules of Civil Procedure, Plaintiff is entitled to a temporary restraining order and preliminary injunction including the following relief:

(a)     That Defendant immediately cease and desist from competing with Plaintiff, as set forth in section 4(a)(i) of the Agreement, until at least January 20, 2017, plus the additional period of time set forth in section 5(b) of the Agreement (the "New Restrictive Period"), including by, among other things, ceasing his employment with Parallon.

(b)     That Defendant immediately cease and desist from soliciting or attempting to solicit Plaintiff's employees, as set forth in section 4(a)(ii) of the Agreement, until the expiration of the New Restrictive Period.

(c)     That Defendant be barred and restrained from doing any of the following during the New Restrictive Period:

(i)      Engaging in the business of arranging or providing temporary nurse, temporary therapy, and/or temporary allied healthcare professional staffing services within a fifty (50) mile radius of Plaintiff's Fort Worth, Texas, office, located at 101 Summit Avenue, Forth Worth, Texas 76102 ("Plaintiff's Forth Worth Office") and/or within a fifty (50) mile radius of any other location where Defendant performed work for Plaintiff;

(ii)      Assisting, advising, representing, or consulting for any other person or entity in connection with such person or entity engaging in any aspect of the business of arranging or providing temporary nurse, temporary therapy, and/or temporary allied healthcare professional staffing services within a fifty (50) mile radius of Plaintiff's Forth Worth Office d/or within a fifty (50) mile radius of any other location where Defendant performed work for Plaintiff;

(iii)      Engaging in the business of arranging or providing travel physician, travel nurse, travel therapy, and/or travel allied healthcare staffing services in the United States;

(iv)      Assisting, advising, representing, or consulting for any other person or entity in connection with such person or entity engaging in any aspect of the business of arranging or providing travel physician, travel nurse, travel therapy, and/or travel allied healthcare staffing services in the United States;

15

(v)     Soliciting or attempting to solicit any employee, subsidiary, or affiliate of Plaintiff, or inducing or attempting to induce any employee of Plaintiff to leave such employ, or to accept any other position or employment or assist any other person or entity in hiring such employee;

(vi)     Soliciting or attempting to solicit any employee, subsidiary, or affiliate of SHC, or inducing or attempting to induce any employee of SHC to leave such employ, or to accept any other position or employment or assist any other person or entity in hiring such employee;

(vii)     Soliciting or attempting to solicit any clients or customers, including healthcare professionals, for whom Plaintiff performed or performed services and with whom Defendant had any contact or dealings during the twelve months prior to his termination;

(viii)     Soliciting or attempting to solicit any persons or entities disclosed to Defendant, intentionally, as customers or prospective customers of Plaintiff during the twelve months prior to his termination;

(ix)     Disrupting or interfering with, or attempting to disrupt or interfere with Plaintiffs's relations with any actual or potential clients or customers of the Company;

(x)     Publicly disparaging or criticizing or otherwise referring to Plaintiff in an adverse fashion.

(d)     That Defendant take all necessary action to immediately return to Plaintiff all information set forth in section 3(c) of the Agreement.

16

(e)     That Defendant not disclose and/or use any of Plaintiff's Proprietary

Information, as defined and set forth in section 3(a) of the Agreement, and as set

forth in section 3(b) of the Agreement.

(f)     Any additional relief warranted at law or necessary to protect

Plaintiff's rights, to be determined by the facts and circumstances at the time of

entry of the order.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

1.     For judgment on each cause of action as requested;

2.     For injunctive relief as set forth above;

3.     For an award of damages plus interest, costs, and attorney's fees; and

4.     For such other relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Counterclaim

Plaintiffs request a jury trial on all issues so triable.

DATED this 3rd day of June, 2016.

MAGLEBY CATAXINOS & GREENWOOD


_____
Christine T. Greenwood
Jennifer Fraser Parrish
Kennedy D. Nate

*Attorneys for Plaintiff*